David BREWSTER, et al., Plaintiffs,

v.

Michael S. DUKAKIS, et al., Defendants.

Civ. A. No. 76–4423–F.

United States District Court, D. Massachusetts.

July 16, 1982.

---

See also, 1st Cir., 675 F.2d 1; D.C., 520 F.Supp. 882.

Steven J. Schwartz, Mental Patients Advocacy Project, Western Mass. Legal Services, Northampton State Hosp., William C. Newman, Northampton, Mass., for plaintiffs.

Nonnie S. Burnes and Robert G. Bone, Hill & Barlow, Boston, Mass., for Mass. Ass'n for Retarded Citizens.

Michael Broad and Catherine A. White, Asst. Attys. Gen., Boston, Mass., for Evelyn McLean and Linda Glenn.

Michael Ponsor, Brown, Hart & Ponsor, Amherst, Mass., monitor for consent decree.

### MEMORANDUM

FREEDMAN, District Judge.

This case is before the Court on plaintiffs' application for an interim award of attorneys' fees pursuant to 42 U.S.C. § 1988. This statute provides that:

> In any action or proceeding to enforce a provision of [42 U.S.C. § 1983], the court, in its discretion, may allow the prevailing party . . . a reasonable attorney's fees as a part of costs.

The plaintiffs' attorneys have submitted extensive material purporting to summarize

their efforts for the years 1976 to 1981.[1] Their total fee claim for these years exceeds 1.2 million. The defendants oppose the award of any attorneys' fees. Alternatively, they argue on a variety of grounds that plaintiffs' fee claim should be reduced. The Court agrees with defendants that a substantial reduction of the fee claim is warranted. For reasons detailed below, the Court finds that plaintiffs are entitled to $386,204.01 in attorneys' fees and costs.

## I. *The Decree*

On December 15, 1976 plaintiffs filed this suit as a class action under 42 U.S.C. § 1983 and other federal and state statutes against various officials of the Commonwealth of Massachusetts. The essence of the action was plaintiffs' demand that the defendants create and maintain appropriate community programs for persons institutionalized at Northampton State Hospital. On August 22, 1977, the Massachusetts Association for Mental Health, Inc. ("MAMH") and the Massachusetts Association for Retarded Citizens, Inc. ("MARC") were permitted to intervene as plaintiff-intervenors.

The plaintiff class, defined as all persons who were, as of December 15, 1976, are, or may be hospitalized at the Northampton State Hospital, was certified by this Court on October 27, 1977. Between October 1977 and October 1978, the plaintiffs and defendants engaged in a "planning process"—at the request of the Court—in an attempt to negotiate a plan for community mental health services for class members in Western Massachusetts and, if possible, to resolve the issues presented by the litigation without a trial.

On October 23, 1978, plaintiffs and defendants agreed, again at the suggestion of the Court, to incorporate the result of their planning process into a Consent Decree. After approximately six weeks of drafting, all parties signed the Consent Decree on December 6, 1978, and the Court approved the Decree after hearing on December 7, 1978.

At the time of its signing, this Decree was—to the best of the Court's knowledge—the most comprehensive, judicially enforceable plan for the provision of community mental health services in the country. It was a direct product of the year-long cooperative planning efforts of plaintiffs and defendants. The Decree itself contains sixty-two paragraphs setting forth in broad outline the jurisdiction of the Court, definition of terms, principles for creating and maintaining community programs, models for the development of these programs, individual service planning, standards and regulations, personnel and training, evaluation of compliance, and placement procedures. The appointment of a Monitor to oversee implementation, and a description of his or her powers, is included. The Decree also contains over 200 pages of attachments, analyzing the sub-populations to be served, describing in great detail twelve different residential program models and thirteen non-residential models to serve clients with varying levels of need, and mandating various other responsibilities for defendants including development of needed management services.

Although the Consent Decree is an extensive document, it explicitly fails to wrap up definitively all issues related to implementation. The development of a secure treatment center for the residual Northampton State Hospital population inappropriate for community placement (Paragraph 16), the processes for retraining and transfer of hospital staff (Paragraph 35), the creation and maintenance of an adequate training system for community mental health staff (Paragraph 35), the necessity for and design of legal advocacy services for community mental health clients (Paragraph 59), the reorganization and phase-down of the Hospital (Paragraph 43) and the drafting of

---

1. This Memorandum pertains only to the application of attorneys attached to, or consulting with, the Mental Patients Advocacy Project, which represents the named plaintiffs and the plaintiff-intervenor Massachusetts Association for Mental Health. The application on behalf of plaintiff-intervenor Massachusetts Association for Retarded Citizens was received too late for consideration by the Court in this Memorandum and will be addressed at a later date.

Regulations (Paragraphs 32 and 33) exemplify issues left by the Decree to further negotiation between the plaintiffs and the defendants. All of these paragraphs mandate active plaintiff involvement in resolution of outstanding issues.

Beyond this, the Decree itself reaches years into the future with its provisions for community placements (Paragraph 15), upgrading of existing programs (Paragraph 19), development of psychiatric beds in general hospitals (Paragraph 17), program licensing (Paragraph 38), funding (Paragraph 47), individual service planning (Paragraphs 26 and 27), management information services (Paragraph 40), and programming for persons denominated as mentally retarded (Paragraph 20).

Since 1978 the efforts of defendants and plaintiffs have gradually resulted in the emergence of a community mental health system in Western Massachusetts. Hospital census has been reduced by one-third. Plaintiff class members have been assessed and individual service plans drafted to reflect each client's needs and strengths. Crisis intervention programs now function to reduce or entirely eliminate the necessity for institutionalization for many individuals. Both residential and non-residential, including vocational, programming have been expanded and enriched. Appropriations for services for class members have more than quadrupled.

While the full implementation of the Decree has been delayed, significant progress has been made towards providing every plaintiff class member adequate and appropriate treatment in the environment most respectful of his or her freedom and dignity.

Plaintiffs' counsel have played a vigorous and necessary role in implementation. They have assisted in the drafting of regulations, negotiated myriad administrative disputes with the defendants without the necessity of court intervention, consulted with the court-appointed Monitor and participated in mediation with the Monitor regarding disputes not subject to administrative resolution, evaluated the progress towards implementation of the Decree through frequent meetings with Department of Mental Health personnel, reported and vigorously pressed charges of client abuse or neglect both in the community and in the hospital, represented clients during hearings on the drafting of individual service plans called for in the Decree, negotiated several amendments to various paragraphs of the Decree and participated in final negotiations around issues left open by the Decree itself. Several evidentiary hearings on issues such as human resources, legal advocacy and budgetary matters have taken place before this Court, particularly in the past two years. Plaintiffs' counsel have represented the class in three hearings before the First Circuit Court of Appeals.

As in other institutional reform litigation, the entry of the Court's judgment has not terminated the role of the plaintiffs' counsel. In important respects, entry of judgment has represented only a beginning. Without determined, competent and dedicated representation, the provisions of this Consent Decree might have had little practical significance for the class members.

### II. *Attorneys' Fees: General*

Although 42 U.S.C. § 1988 provides for the award of attorneys' fees in the court's discretion, the Supreme Court has held that a successful plaintiff "should ordinarily recover an attorney's fee unless special circumstances would render such an award unjust." *Newman v. Piggie Park Enterprises*, 390 U.S. 400, 402, 88 S.Ct. 964, 966, 19 L.Ed.2d 1263 (1968). (Action for attorneys' fees under Title II of the Civil Rights Act of 1964 § 204(b), 42 U.S.C. § 2000a–3(b)).

The First Circuit has stated: "Parties may be considered to have prevailed when they vindicate rights through a consent judgment." *Nadeau v. Helgemoe*, 581 F.2d 275, 279 (1st Cir. 1978).

■ There is no bar to fees for post-judgment remedial work.

Services devoted to reasonable monitoring of the court's decrees, both to insure

full compliance and to ensure that the plan is indeed working ... are compensable services. They are essential to the long-term success of the plaintiff's suit. *Northcross v. Board of Education*, 611 F.2d 624, 637 (6th Cir. 1979), *cert. denied*, 447 U.S. 911, 100 S.Ct. 2999, 64 L.Ed.2d 862 (1980).

■ It is clear that, in an appropriate case, an interim award of attorney's fees may be ordered. *Hanrahan v. Hampton*, 446 U.S. 754, 757–58, 100 S.Ct. 1987, 1989, 64 L.Ed.2d 670 (1980). Given that judgment has entered pursuant to the Consent Decree and given further that implementation of the Decree has been protracted, the Court finds consideration of an interim award at this time reasonable.

Defendants do not apparently contest any of these propositions. They insist, however, that the plaintiffs are not entitled to *any* attorneys' fees for two reasons. First, they say that the application for fees is not timely, second, they allege that the plaintiffs are not "prevailing parties," as that term is to be understood under the doctrine of *Nadeau v. Helgemoe, supra.*

■ Defendants note that plaintiffs first filed their application for attorneys' fees on March 21, 1981, more than two years after the entry of the Consent Decree and judgment. Acknowledging that *White v. New Hampshire Department of Social Security*, ―― U.S. ――, 102 S.Ct. 1162, 71 L.Ed.2d 325 (1982) permits the District Courts to exercise discretion and award attorney's fees in these circumstances, they nevertheless argue that the court should use its discretion to deny fees on the ground that the defendants have been unfairly prejudiced by the delay.

This argument might carry weight if the litigation had indeed ended on December 7, 1978. However, the plaintiffs and defendants have had an intimate and unbroken relationship since 1976. Despite the Consent Decree, in essential respects, the negotiation, monitoring and litigation have unfolded continuously from the initiation of the suit to the present. Moreover, the defendants' complaint that individuals critical

to an assessment of the attorneys' fees application have moved on to other employment is substantially undercut by the fact that all of these individuals are still employed in eastern Massachusetts and are readily available for discussion and consultation. In fact, some former state employees have filed affidavits or made themselves available for depositions in connection with this application. *See*, Affidavit of Catherine A. White and Deposition of S. Stephen Rosenfeld. The First Circuit has recently held that, in the absence of a local rule, "the determination of timeliness rested within the sound discretion of the District Court." *White v. New Hampshire Department of Employment Security*, 679 F.2d 283, at 285 (1st Cir. 1982), *on remand* from ―― U.S. ――, 102 S.Ct. 1162, 71 L.Ed.2d 325 (1982). The Court finds that the defendants have not suffered any significant prejudice as a result of the timing of filing the attorneys' application. This factor, therefore, will not bar payment of fees.

The issue of whether plaintiffs were "prevailing parties" is somewhat more complicated.

■ In *Nadeau v. Helgemoe, supra*, the First Circuit established two criteria for determining when a party will be considered to have "prevailed" for purposes of the attorneys' fees statute. First, the plaintiffs must demonstrate that the lawsuit was factually the "catalyst" which prompted the defendants to take particular action. Second, even if the lawsuit were the catalyst, defendants' action must not be "gratuitous," but must flow from some legal compulsion.

■ Defendants point to the declining populations of other institutions for the mentally ill and mentally retarded throughout the state as evidence that census reduction at Northampton State Hospital constitutes part of a voluntary state-wide policy, and has *not* been compelled or catalyzed by the lawsuit.

The defendants' emphasis on mere census reduction, however, entirely avoids the central theme of the *Brewster* litigation. The

goal of this action has never been census reduction alone; this may be a euphemism for what has been more pungently described as "dumping"—or placing clients into the community without adequate services. On the contrary, the goal of this litigation has been the creation of "a comprehensive system of appropriate, less restrictive treatment, training and support services ...." Consent Decree, Paragraph 3.

On this score, the Decree has been an agent for progress. Millions of new dollars have been committed by the state in recent fiscal years to press forward with the development of a community mental health system in the Western third of the Commonwealth. Defendants do not allege that the exponential growth of this system in the geographic area covered by the Decree has been duplicated elsewhere in the State. Recognizing the unique growth of community mental health services subject to this Decree, the Department of Mental Health's Individual Service Plan and Non-Residential Regulations have been made applicable *only* to *Brewster* class members. Prior to the promulgation of the Consent Decree, the expenditures for community mental health programs for Region I were the lowest in the state; subsequent to the Decree, they became the highest.

Moreover, a "policy" favoring movement of clients from institutional to community settings apparently dates back at least to 1966, when the Legislature made community mental health treatment the preferred alternative. But policy commitments by themselves do not necessarily garner hard results. By 1978, when this Decree was signed, little more than the barest skeleton of a community mental health system existed in this part of the Commonwealth. The Court finds that this lawsuit was a catalyst which led to the remedies described in the Decree.[2]

The assertion that the actions of the state defendants were gratuitous, and not incited by any constitutional or statutory considerations is similarly groundless. The First Circuit has carefully articulated the method for assessing the validity of a fee claim against this criterion.

Even if plaintiffs can establish that their suit was causally related to the defendants' actions which improved their condition, this is only half of their battle. The test they must pass is legal as well as factual. If it has been judicially determined that defendants' conduct, however beneficial it may be to plaintiffs' interests, is not required by law, then defendants must be held to have acted gratuitously and plaintiffs have not prevailed in a legal sense. *See Taylor v. Safeway Stores, Inc.* [524 F.2d 263, 273 (10th Cir. 1975)]. In the present case ... there has not yet been a judicial determination of whether plaintiffs' rights were violated under traditional standards of analysis. In such circumstances, one might argue that the district court cannot meaningfully decide the legal requirements that govern defendants' conduct without conducting the very trial the consent decree was signed to avoid. However, we believe the court has had sufficient exposure to the facts and law of this case to determine, whether if plaintiffs had continued to press their claims under traditional constitutional theory, their action could be considered "frivolous, unreasonable, or groundless, or that the plaintiff continued to litigate after it clearly became so." *Christianburg Garment Co. v. E.E.O.C.,* 434 U.S. 412, 422, 98 S.Ct. 694, 701, 54 L.Ed.2d 648 (1978) (the standard under which defendants may be entitled to attorney's fees under the 1964 Civil Rights Act).

*Nadeau v. Helgemoe, supra* at 281.

No court has determined that defendant's conduct is not required by law. The recent Supreme Court decision in *Youngberg v. Romeo,* —— U.S. ——, 102 S.Ct. 2452, 73 L.Ed.2d 28 (1982), offers general support

---

**2.** Defendants appear to concede that plaintiffs' actions were not "completely superfluous" in effecting programmatic change. *Nadeau v. Helgemoe, supra,* at 281. Defendants' Brief at 8, n. 4. Plaintiffs prevail if they succeed "on any significant issue which achieves some of the benefit the parties sought in bringing the suit." *Id.,* at 279.

for the position taken by plaintiffs in their lawsuit. By 1978, lower courts had supported the requirement of treatment in the least restrictive environment. *Dixon v. Weinberger*, 405 F.Supp. 974 (D.D.C.1975); *Lessard v. Schmidt*, 349 F.Supp. 1078 (E.D. Wis.1972), *vacated and remanded on other grounds*, 414 U.S. 473, 94 S.Ct. 713, 38 L.Ed.2d 661 (1974). More recently, of course, the concept has received additional support. *See, e.g., Commonwealth v. Nassar*, 380 Mass. 908, 406 N.E.2d 1286 (1980).

Moreover, the fact that plaintiffs' original complaint lacked *definitive* constitutional support does not bar fees. The purpose of § 1988 is to encourage civil rights actions that may press the boundaries of black-letter doctrine. *Furtado v. Bishop*, 635 F.2d 915, 918–19 (1st Cir. 1980). Certainly, plaintiffs' action is not frivolous, unreasonable or groundless.

The Court finds that plaintiffs have sufficiently "prevailed" in both the legal and the factual sense within the meaning of § 1988, to warrant payment of attorneys' fees.[3]

### III. *Calculation of the "Lodestar"*

Having determined that neither of defendants' arguments would bar completely payment of attorneys' fees, the Court turns to analysis of the proper method for calculating the amount of fees to be paid.

The method for calculating appropriate attorneys' fees under § 1988 has been clearly described in *Furtado v. Bishop*, 635 F.2d 915 (1st Cir. 1980), which refined the previous decision in *King v. Greenblatt*, 560 F.2d 1024 (1st Cir. 1977), *cert. denied* 438 U.S. 916, 98 S.Ct. 3146, 57 L.Ed.2d 1161 (1978). In *Furtado*, the First Circuit approved the "lodestar" approach to fee calculation and cited with approval *Copeland v. Marshall*, 641 F.2d 880 (D.C.Cir.1980) (*en banc*). *See also, Lindy Bros. Builders, Inc. v. American Standard Radiator & Sanitary Corp.*, 540 F.2d 102 (3rd Cir. 1976) (*en banc*). More recently, in *Miles v. Sampson*, 675 F.2d 5

(1st Cir. 1982), the Court of Appeals has summarized the procedure for making the calculation.

> Under this method, there are two principal steps to computing an award of fees. First, a "lodestar" fee is determined by multiplying a reasonable hourly rate by the number of hours reasonably expended on the lawsuit. Second, the "lodestar" is adjusted up or down to reflect factors, such as the contingent nature of success in the lawsuit or the quality of legal representation which have not *already* been taken into account in computing the "lodestar" and which are shown to warrant the adjustment by the party proposing it.

*Id.*, at 8.

The Court's analysis in this case will begin with a calculation of reasonable hourly rates for each of the attorneys involved. The Court will then determine the reasonable number of hours expended on the lawsuit, making certain reductions in consideration of factors to be detailed below. Finally, the Court will address the issue of whether the "lodestar" should be adjusted upward or downward, as urged by the plaintiffs and defendants respectively.

### A. *Reasonable Hourly Rates*

#### STEVEN J. SCHWARTZ

Steven J. Schwartz, the lead counsel for the plaintiffs, is a 1971 *cum laude* graduate of Harvard Law School. Attorney Schwartz practiced as staff attorney of the Western Massachusetts Legal Services, staffing their Greenfield, Northampton, and Northampton State Hospital offices; he has specialized in poverty law cases and represented institutionalized persons at Northampton State Hospital. In 1976, Attorney Schwartz established, through a grant from the National Institute for Mental Health ("NIMH") the Mental Patients' Advocacy Project, a program designed to train lay advocates to represent mentally

---

**3.** The exception to this general conclusion is the work done during the year 1981, when plaintiffs did not prevail factually on two discrete issues. These issues will be addressed below.

disabled persons. Attorney Schwartz is a nationally recognized expert who has contributed to securing the rights of institutionalized mentally disabled persons through litigation, legislative and regulatory development, consultation and publications.

The lodestar rate requested for Attorney Schwartz is $80.00 per hour for 1976, $90.00 per hour for 1977, $100.00 per hour for 1978, $110.00 per hour for 1979 and $120.00 per hour for 1980.

The Court believes that this fee range is somewhat above the level generally demanded by others with Attorney Schwartz's background and above rates awarded in similar cases. Defendants have suggested rates of $50.00 to $80.00 per hour and the Court finds a fee of $80.00 for Attorney Schwartz's "core" litigation services to be reasonable. In this district fees for similar work have ranged from $50.00 to $100.00 per hour. *See Ingerson v. Hogan*, No. 76–3255–S (D.Mass. Order entered April 6, 1982) slip op. at 5, n. 2. To compensate plaintiffs for delay in payment, the Court will use the same hourly rate for all years claimed.

Slightly lesser rates should be paid for activities in the nature of support and preparation. Thus, the Court will award Attorney Schwartz the full hourly rate for the time spent during meetings directly related to litigation, during direct meetings with the Attorney General, for court appearances and for activity directly related to court appearances including the preparation of briefs and memoranda. Monitoring and implementation of the Decree, along with drafting of regulations, have been awarded the slightly lower rate of $70.00 per hour, in recognition of the fact that these activities are, on the one hand, not as strenuous as litigation, but on the other hand are demanding tasks requiring a high degree of experience and professionalism. Other activities, including correspondence, telephone calls, general planning and negotiating ses-sions, general research and consultation activities and work in connection with preparation of the application for attorneys' fees have been compensated at the still lower hourly rate of $60.00 per hour,[4] recognizing that these activities are less strenuous and ancillary to the basic tasks of litigation and implementation of the Decree.

### ROBERT D. FLEISCHNER

Robert D. Fleischner, co-counsel for the plaintiffs, is a 1973 graduate of Boston College Law School. As a practicing attorney at Western Massachusetts Legal Services for five years, Attorney Fleischner has had experience in representing clients in poverty law cases, and has specialized in juvenile and education law. As Assistant Director at the Mental Patients Advocacy Project he has, along with Attorney Schwartz, taken primary responsibility for the conduct of this litigation, for the years 1978–80. In addition, he has represented clients in civil commitment and guardianship hearings and participated as *amicus curiae* in related cases. Attorney Fleischner teaches mental health law at Smith College Graduate School for Social Work. As a mental disability law expert he has consulted nationally.

Attorney Fleischner's lodestar request is $80.00 per hour for 1978, $90.00 per hour for 1979, and $100.00 per hour for 1980.

For reasons described in the discussion regarding Attorney Schwartz, the Court will award a fee of $80.00 per hour for "core" litigation and fees of $60.00 to $70.00 per hour for other activities.

### OTHER COUNSEL

Well over 90% of the hours expended by plaintiffs' counsel in this case were put in by Attorneys Schwartz and Fleischner. The hours claimed by six other counsel have not been broken down by task in the plaintiffs' submissions with the same specificity as the hours of Attorneys Schwartz and

---

**4.** Defendants' brief suggests $57.50 as a reasonable hourly rate for preparation of the fees application. Defendants' brief at 27. Courts may use varying rates to compensate attorneys for more or less demanding tasks. *Miles v. Sampson, supra* at 9.

Fleischner.[5] It is clear from the submissions, however, that the bulk of the hours contributed by these attorneys came mainly in connection with core litigation activities, such as preparation of memoranda or strategy conferences. Recognizing the lack of specificity, however, the Court has set the rates of these attorneys towards the lower end of the allowable range.

### JAN C. COSTELLO

As a 1976 graduate of the Yale Law School, Jan C. Costello worked for two years as staff attorney at the Mental Patients Advocacy Project, 1976–78. Prior to this experience, Attorney Costello worked as an intern/law clerk with the Mental Health Law Project in Washington D. C. Although a recent graduate, Attorney Costello had specialized training and experience in mental disability law.

The lodestar request for Jan C. Costello is $50.00 per hour for 1976, $55.00 per hour for 1977, and $60.00 per hour for 1978.

Because of her relative inexperience at the time, the Court has awarded a flat rate of $50.00 per hour for her work.

### WILLIAM C. NEWMAN

Attorney Newman graduated in 1976 from Northeastern University School of Law and is a partner in the Northampton law firm of Lesser, Newman, Sibbison & Souweine. Attorney Newman has specialized in civil rights and mental health litigation. He has participated as a consultant in the preparation and litigation of this case.

The lodestar request for William C. Newman is $55.00 per hour for 1976, $60.00 per hour for 1977 and $65.00 per hour for 1978.

Because of his relative inexperience at the time, the Court has awarded a flat rate of $50.00 per hour for his work.

### THOMAS B. LESSER

Attorney Thomas Lesser is a 1971 graduate of Harvard Law School and a partner of the Northampton law firm of Lesser, Newman, Sibbison & Souweine. Attorney Lesser has extensive trial experience in federal and state court and he has represented clients in commitment hearings at Northampton State Hospital. Attorney Lesser brought his expertise as a consultant in the early pre-trial and trial aspects of this case.

Thomas Lesser's lodestar request is $65.00 per hour for 1976, $70.00 per hour for 1977, $75.00 per hour for 1978.

The Court will award a flat rate of $60.00 per hour, given Attorney Lesser's background and taking into consideration that he acted mainly as a consultant without primary responsibility for the conduct of the litigation.

### STEPHEN ARONS

Attorney Arons is an Associate Professor of Legal Studies at the University of Massachusetts and a 1969 *cum laude* graduate of Harvard Law School. Attorney Arons participated in the development of the Mental Patients Advocacy Project and acted initially as director. Attorney Arons has extensive knowledge and experience in constitutional law and federal court litigation. As an expert in the field of mental disability law, he has provided consultation to this lawsuit and other cases around the country.

The lodestar request for Stephen Arons is $100.00 per hour for 1976 through 1978. His awarded rate is discussed below.

### IRA HOROWITZ

Ira Horowitz is a 1968 graduate from the University of Chicago Law School and was Director of Litigation and Training at Western Massachusetts Legal Services. Attorney Horowitz has had substantial experience in public interest litigation particularly in the federal courts. Attorney Horowitz acted as senior consulting attorney on this law suit providing expertise in developing legal theories and planning litigation. He has been a training consultant to the Office of Program Support of the Legal Services Corporation in Washington, D. C.

The lodestar request for Attorney Horowitz is $100.00 per hour for 1976 through 1978. His awarded rate is discussed below.

---

**5.** A breakdown of hours by type of task is made only for "other" attorneys, so it is diffi- cult to determine which of these attorneys was employed on which category of task.

## E. OLIVER FOWLKES

Attorney Fowlkes is a 1968 law school graduate and an assistant professor of law at Hampshire College. Attorney Fowlkes is experienced in representing institutionalized persons and assisted in the development of the Mental Patients Advocacy Project. As an expert in disability law, Attorney Fowlkes has been involved in several class action suits representing institutionalized mental patients. He has published papers, and has acted as a consultant for the National Institute for Mental Health.

The lodestar request for E. Oliver Fowlkes is $100.00 per hour for 1976 through 1978.

Attorneys Arons, Fowlkes and Horowitz, as noted, are experienced attorneys in the area of mental health law, used mainly as consultants in the preparation of briefs and memoranda, or during meetings in the early stages of the litigation. Their experience, in more primary roles, might justify the award of higher hourly rates, but in view of their role as consultants only, the Court has awarded flat hourly rates of $70.00 per hour for each.

### B. *Hours Reasonably Expended*

The plaintiffs have submitted schedules detailing the hours claimed to have been expended in connection with this litigation. The material was presented to the Court in two segments including a schedule of hours spent thru calendar year 1980 and a schedule of hours expended during the calendar year of 1981. For reasons to be explained, the Court will calculate the lodestars for the periods 1976 through 1980 and 1981 separately.

The attached appendix details the number of hours claimed by each of the eight attorneys involved in this case by year and, in the case of Attorneys Schwartz and Fleischner, by category of task.

### 1) *1976–1980*

Attorney Schwartz has calculated the total hours spent by him in connection with this litigation for the five years in question as 4,143.75. Total hours claimed by Attorney Fleischner are 628.55.

The requested total hours for the other six counsel employed in this case are as follows:

|  | Hours |
|---|---|
| Jan C. Costello | 140.0 |
| William C. Newman | 63.0 |
| Thomas Lesser | 127.5 |
| Ira Horowitz | 84.8 |
| Stephen Arons | 50.2 |
| E. Oliver Fowlkes | 21.5 |

Thus, the total number of attorney hours claimed by plaintiffs in the years 1976 through 1980 is 5,259.3.

Defendants have not suggested that any of the hours claimed in any way has been deliberately misrepresented. They do argue, however, that plaintiffs have made claims for unnecessary work, or for time not properly compensable. More vigorously, they criticize as unreliable the methods used by the plaintiffs in reconstructing time records which were not contemporaneously maintained. The Court will address each of the defendants' arguments.

First, the defendants argue that legal representation consisting of general monitoring and implementation of the Decree is not compensable. The only legal work for which plaintiffs' counsel are entitled to payment, say defendants, must grow out of post-Decree disputes in which plaintiffs can claim to be "prevailing parties."

This argument ignores the fact that the Decree itself clearly envisions a prominent role for plaintiffs' counsel in implementation. As described above, numerous paragraphs of the Decree *mandate* plaintiff involvement. Defendants signed the Decree knowing this fact and knowing, further, that an application for counsel fees by plaintiffs might be submitted. Deposition of S. Stephen Rosenfeld, at 40–41.

It would be entirely contrary to the concept of cooperation underlying a Consent Decree, and would compromise judicial economy, to require plaintiffs' counsel to inflate every implementation negotiation into a full scale dispute in which they would

then "prevail," in order to justify attorneys' fees. As noted, the Court has found that the plaintiffs "prevailed" for purposes of § 1988 when the Consent Decree was entered; work necessarily related to insuring implementation of the Decree, or called for by the Decree itself, is compensable.[6] The Court finds that the sorts of tasks performed by plaintiffs' counsel fall into this category. *See Northcross v. Board of Education, supra,* at 637.

To the extent that plaintiffs' post-Decree activities may have been superfluous or excessive, the Court will consider this factor in determining a percentage reduction of the requested hours. To the extent that implementation activities are less demanding than actual trial work, the Court has already reduced plaintiffs' hourly rates.

Second, with regard to the period *prior* to entry of the Decree, defendants assert that no fees should be allowed for the period when plaintiffs were engaged in a "planning process" with defendants. They allege that the considerable number of hours spent by the plaintiffs in the biweekly planning meetings during this period "had little to do with the substance of the lawsuit." Defendants' Brief at p. 12.

This is not the case. The planning process was undertaken at the request of the Court explicitly as an effort designed to obviate the necessity for a trial and, if possible, deliver to the plaintiff class services that all parties seemed to recognize as crucial, without adversarial litigation. The last paragraph of the plaintiffs' written response to the defendants' letter of October 18, 1977 to the Court makes this clear.

> We would hope that the above clarification will be promptly accepted by all parties in order that the planning process, *and the eventual resolution of this litigation,* can proceed without further delay.

Letter dated November 8, 1977 from plaintiffs' counsel Steven J. Schwartz and Bois-

feuillet Jones, Jr. to Assistant Attorney General S. Stephen Rosenfeld, (emphasis supplied). Exhibit B to Affidavit of Catherine White, Defendants' Appendix at 12.

In addition, the biweekly planning meetings clearly generated the pitch of the subsequent Consent Decree. Properly understood, this process was essentially an extended settlement negotiation. It is hardly surprising, given the complexity of this form of public institutional litigation, that the negotiations were unusually protracted.

Finally, the defendants themselves have frequently conceded the plaintiffs' critical and appropriate role in the planning process that led to the Decree. In their letter to the Court of October 18, 1977, under the heading "Role of Plaintiffs," counsel for the defendants clearly recognized this.

> The defendants envision counsel for the plaintiffs playing a substantial role in this process [i.e. the planning process] both in their formal capacity in this lawsuit and in their continuing capacity as advocates for individual residents at Northampton. We see them making an especially valuable contribution in helping to develop procedures for transfer as well as assisting in the location and development of suitable community placements.

Exhibit A of Affidavit of Catherine White, Defendants' Appendix at 7.

It is hardly equitable for defendants to seek actively plaintiffs' assistance on the one hand, and bar fees for these very contributions on the other.

It is worth noting, moreover, that plaintiffs' activities during the "planning process" have generally been compensated at a lower hourly rate than other work. The Court finds that this reduced fee rate is appropriate.

Defendants advance as their third argument for reducing the fee, that plaintiffs

---

**6.** Despite the use of the term "monitoring" the activities of plaintiffs' counsel have not duplicated those of the court-appointed Monitor. The Monitor evaluates services under the Decree, resolves minor disputes, attempts to mediate major disputes, makes suggestions for implementation and submits reports to the Court. He does not have direct responsibility for insuring implementation of the Decree or advocating on behalf of plaintiff class members.

are not entitled to compensation for work devoted to discrete issues on which they clearly did *not* prevail. On this point, the Court agrees. This argument applies only to work done in 1981, however, and will be addressed below.

Fourth, defendants object to "over-lawyering" on the part of plaintiffs, as tending to inflate the fee claim. With this contention, the Court again agrees. Review of the plaintiffs' submissions demonstrates that as many as four separate counsel attended meetings at the early stages of the litigation. This factor has been considered by the Court in rendering a percentage reduction of the hours claimed.

Finally, and perhaps most importantly, defendants object to plaintiffs' manner of reconstructing time records. It is not disputed that for the years 1976–1979 plaintiffs did not maintain contemporaneous time records. To some extent this is understandable. The controlling statute did not take effect until 1976. Before *Reynolds v. Coomey*, 567 F.2d 1166, 1167 (1st Cir. 1977) some confusion existed as to whether legal services attorneys were always entitled to fees.

On the other hand, while a lack of contemporaneous time records would not justify elimination of attorneys' fees *in toto*, in this case the Court agrees that a significant reduction of the hours claimed is appropriate.

For the foregoing reasons, the Court will reduce all the compensable hours claimed by twenty percent. In making an across-the-board percentage reduction in requested compensable hours, rather than performing an item-by-item accounting, the Court is following accepted practice. *Copeland v. Marshall, supra*, 641 F.2d at 903.

The lodestar for the years 1976–1980 has been calculated in Section V. The totals are as follows:

| | Amount |
|---|---|
| Steven J. Schwartz | $216,856.40 |
| Robert D. Fleischner | 34,875.60 |
| Jan C. Costello | 5,600.00 |
| Thomas Lesser | 6,120.00 |
| William C. Newman | 2,520.00 |
| Steven Horowitz | 4,748.80 |
| Stephen Arons | 2,811.20 |
| E. Oliver Fowlkes | 1,204.00 |

The plaintiffs have claimed up to $65.00 per hour for travel. Particularly in view of the necessity to commute from the western part of the state to Boston for frequent meetings, the Court finds that some fees for travel time are justified. Defendants concede this but object that the claimed rate is too high. The Court agrees that travel rates should be drastically reduced and will order $20.00 per hour for travel. Thus the total time claimed for travel for 1976–1980 is 303 which, at a rate of $20.00 per hour, leaves a total of $6,060.00. Adding $14,115.00 in costs results in a total lodestar for 1976–80 of $294,911.00.

### 2) *1981*

Turning to the year 1981, the issues are both simpler and more complicated. On the one hand, claims are made only for the representation by Attorneys Fleischner and Schwartz, who claim 721.4 and 279.55 hours respectively. The details of their claims, by category, appear in Section V of this Memorandum. The issue of maintenance of contemporary time records is almost eliminated because by this period both attorneys were maintaining such records, in general. Similarly, the problem of duplication of representation is much reduced due to the absence of other attorneys involved in the case. In view of the complexity of the issues involved the Court is not inclined to penalize the plaintiffs for the attendance of two attorneys at some hearings or meetings. It is worth noting that the defendants in general had at least two, and sometimes more, attorneys at pertinent hearings or meetings.

On the other hand, the issues in calculation of fees during this year are more complicated, due to the failure of the plaintiffs to "prevail" on at least two issues.

On the issue of the fiscal year 1982 (FY '82) budget, two hearings were held before this Court and two arguments before

the First Circuit Court of Appeals. Orders and memoranda were issued by this Court on September 15 and December 23, 1981, which were subsequently modified and affirmed in part and vacated in part by the Court of Appeals. *Brewster v. Dukakis*, 675 F.2d 1 (1st Cir. 1982). It is clear that at least as regards *part* of the FY '82 budget issue, the plaintiffs were not the prevailing party. At the same time, the fact that the plaintiffs were prevailing with regard to a portion of this issue makes it difficult to quantify arithmetically the precise number of hours that might be justified in connection with litigation of this issue.

In addition, the Court held hearings and rendered an opinion on the issues of legal advocacy and human resources for clients. *Brewster v. Dukakis*, 520 F.Supp. 882 (D.Mass.1981). While defendants did not appeal the Court's decision on human resources, the Court's Order on advocacy was appealed and has recently been vacated and remanded. *Brewster v. Dukakis*, No. 81–1687, (1st Cir. June 22, 1982). Again, because this Court's initial decision entwined two issues, a precise division of time is not possible. The fact that it is difficult to separate out time spent according to whether a litigant prevailed or did not prevail will not justify total disallowance of the claim. *Nadeau v. Helgemoe*, at 279.

Based on this, the Court will reduce the hours claimed by Attorneys Fleischner and Schwartz for litigation activities by one-third for 1981, and for all other activities by ten percent.[7] The computation is set forth in Section V; total hours for Attorney Schwartz are 619.52, and for Attorney Fleischner, 237.88. Multiplying these hours by the awarded rates results in a 1981 lodestar for Attorney Schwartz of $40,298.80, and for Attorney Fleischner of $15,966.70.

Calculating twenty-eight hours of 1981 travel at $20.00 per hour adds $560.00 to their total.

Thus, adding costs of $926.24, the total lodestar for 1981 is $57,751.74.

## IV.  *Adjustment of Lodestar*

The plaintiffs have requested that the Court increase the lodestar amount by 100%, pointing to the contingent nature of the case, the substantial delay in payment, the quality of the attorneys' work, and the significance of the results, all factors to be considered under the rubric of *King v. Greenblatt, supra*, in the framework of the *Lindy-Copeland-Furtado* decisions.

The Court finds that as to all of the factors suggested, a substantial increase in the lodestar amount would be warranted.

First, the case was highly contingent in nature. The judicial and constitutional underpinnings of the plaintiffs' claim, while not illusory, did lack definitive support at the time the suit was filed. Even today, the precise boundaries of the rights of the plaintiff class remain unclear. Courts have awarded an increase to the lodestar amount in response to considerations of contingency such as were faced by the plaintiffs in this case. *Stenson v. Blum*, 512 F.Supp. 680 (S.D.N.Y.1981) *aff'd*, 617 F.2d 493 (2nd Cir. 1981), *petition for cert. docketed*, 50 U.S. L.W. 3744 (U.S. March 16, 1982) (50% increase), *Halderman v. Pennhurst*, 533 F.Supp. 661 (E.D.Pa.1982) (300% and 50% increases).

Second, the Court is sensitive to the excellent quality of work performed by the plaintiffs' attorneys and to their high degree of dedication, which has been far above the level that might ordinarily be expected from attorneys with their experience and background. Partly because of this level of competence and commitment, the Consent Decree was first negotiated and finally drafted, saving the Court and more importantly the disabled clients at issue here the strain and delay of a lengthy

7. In making the percentage reductions in claimed hours for all six years, the Court has taken into consideration that plaintiffs have made no claim for compensation for some 2,000 hours for work performed by paralegals and law students. It would not have been improper to claim paralegal hours as part of a fee request, *Lamphere v. Brown University*, 610 F.2d 46, 48 (1st Cir. 1979), and the Court's reduction might have been more severe had these hours been included in the application. *See also Furtado v. Bishop, supra*, at 920.

trial. Along with the staff of paralegals they have trained, they have represented clients in individual complaints both in the Hospital and in the scores of small programs now established in the community. They have not only assisted in drafting regulations, but have assisted all community programs under the Decree to give workshops to staff on the content of the regulations. In addition to legal skills, the issues in the Decree have necessitated a close familiarity with a body of relevant clinical knowledge, as well as knowledge of the state's fiscal and administrative processes. Since their efforts often broke new ground, they lacked the assistance of prior models to guide them in carrying out their broad responsibilities under the Decree.[8] The Court finds the quality of work justifies a percentage increase in the lodestar.

Third, the significance of the results obtained is unusually impressive. Only the faint outlines of the community mental health system could be perceived at the outset of this litigation; the Consent Decree has produced a functioning community mental health system able to respond flexibly in most cases to the needs of thousands of mentally disabled persons in the western part of the state of Massachusetts. Plaintiffs have had a substantial role in creating this system and deserve an increase to their fee based on this outstanding result.[9]

Absent countervailing considerations, the Court would be inclined to increase the lodestar amount by at least 50%. However, the Court agrees with defendants that countervailing considerations do exist in this case. First, the defendants themselves are to be complimented for their generally high degree of flexibility and dedication. Obviously the enormous amount achieved through the implementation of this Decree to date would not have been possible without a substantial degree of cooperation among plaintiffs and defendants. Second, the Court is sensitive to the fact that this legal fee will be paid out of the public treasury. *See Keyes v. School District No. 1*, 439 F.Supp. 393, 414–415 (D.Colo.1977). Third, the Court takes notice that the fee in any case is substantial, that a second application for attorneys' fees for the plaintiff-intervenor is still pending and, finally, that additional interim applications for attorneys' fees can be anticipated for at least this year and the coming year. For all the foregoing reasons, the Court has determined to increase the amount of the attorneys' fees by 10% in recognition of the contingent nature of the case, the high quality of work performed by the plaintiffs' counsel, and the significance of the result. This 10% adjustment will be added to the total actual attorneys' fees award.

## V. Calculation of Attorneys' Fees

The detailed calculation of attorneys' fees is as follows:

ATTORNEY SCHWARTZ 1976–1980

| | Hours | Adjustment | Rate | Total |
|---|---|---|---|---|
| General Correspondence: | 362.65 | 290.12 | $60 | $17,407.20 |
| Court Correspondence: | 53.60 | 42.88 | $60 | 2,572.80 |
| Telephone: | 1023.30 | 818.64 | $60 | 49,118.40 |

---

8. Because of the uncertainty now surrounding the issue of the state's responsibility to fund advocacy services, and the expiration of the NIMH grant which has hitherto funded plaintiffs' counsel, an appropriate grant of attorneys' fees may be a significant source of funds for prospective legal services for the class.

9. Plaintiffs have offered a fourth reason for increasing the lodestar amount—delay in payment—which the Court rejects. First, by waiting over two years to file their application, plaintiffs themselves contributed to the delay. Second, by assigning the same hourly rates for work over several years the effect of delay in payment is muted.

|  | Hours | Adjustment | Rate | Total |
|---|---|---|---|---|
| Planning and Negotiating Meetings: | 971.70 | 777.36 | $60 | 46,641.60 |
| Litigation Meetings: | 296.85 | 237.48 | $80 | 18,998.40 |
| Monitoring and Implementation Meetings: | 420.15 | 336.12 | $70 | 23,528.40 |
| Attorney General Meetings: | 43.00 | 34.40 | $80 | 2,752.00 |
| Regulations: | 249.70 | 199.76 | $70 | 13,983.20 |
| Court (briefs and appearances): | 447.50 | 358.00 | $80 | 28,640.00 |
| Research: | 238.00 | 190.40 | $60 | 11,424.00 |
| Attorneys' Fees: | 37.30 | 29.84 | $60 | 1,790.40 |
| TOTALS | 4143.75 | 3315.00 | | $216,856.40 |

ATTORNEY SCHWARTZ 1981

|  | Hours | Adjustment | Rate | Total |
|---|---|---|---|---|
| General Correspondence: | 94.80 | 85.32 | $60 | $ 5,119.20 |
| Court Correspondence: | 40.00 | 36.00 | $60 | 2,160.00 |
| Telephone: | 91.30 | 82.17 | $60 | 4,930.20 |
| Litigation Meetings: | 32.10 | 21.51 | $80 | 1,720.80 |
| Monitoring and Implementation Meetings: | 132.00 | 118.80 | $70 | 8,316.00 |
| Regulations: | 23.00 | 20.70 | $70 | 1,449.00 |
| Court (In Court): | 22.90 | 15.34 | $80 | 1,227.20 |
| Court (preparation): | 74.30 | 49.78 | $80 | 3,982.40 |
| Briefs and Memoranda: | 205.00 | 136.66 | $80 | 10,932.80 |
| Attorneys' Fees: | 6.00 | 5.40 | $60 | 324.00 |
| TOTALS: | 721.40 | 571.68 | | $40,161.60 |

ATTORNEY FLEISCHNER 1976–1980

|  | Hours | Adjustment | Rate | Total |
|---|---|---|---|---|
| General Correspondence: | 61.45 | 49.16 | $60 | $ 2,949.60 |
| Court Correspondence: | 0.00 | 0.00 | | 0.00 |
| Telephone: | 39.80 | 31.84 | $60 | 1,910.40 |
| Planning and Negotiating Meetings: | 0.00 | 0.00 | | 0.00 |
| Litigation Meetings: | 120.35 | 96.28 | $80 | 7,702.40 |
| Monitoring and Implementation Meetings: | 225.10 | 180.08 | $70 | 12,605.60 |

| | Hours | Adjustment | Rate | Total |
|---|---|---|---|---|
| Attorney General | | | | |
| Meetings: | 0.00 | 0.00 | | 0.00 |
| Regulations: | 111.35 | 89.08 | $70 | 6,235.60 |
| Court (briefs and appearances): | 5.50 | 4.40 | $80 | 352.00 |
| Research: | 63.00 | 50.40 | $60 | 3,024.00 |
| Attorneys' Fees: | 2.00 | 1.60 | $60 | 96.00 |
| TOTALS | 628.55 | 502.84 | | $34,875.60 |

### ATTORNEY FLEISCHNER 1981

| | Hours | Adjustment | Rate | Total |
|---|---|---|---|---|
| General | | | | |
| Correspondence: | 0.00 | 0.00 | | $ 0.00 |
| Court | | | | |
| Correspondence: | 0.00 | 0.00 | | 0.00 |
| Telephone: | 21.65 | 19.49 | $60 | 1,169.40 |
| Litigation | | | | |
| Meetings: | 29.10 | 19.50 | $80 | 1,560.00 |
| Monitoring and Implementation | | | | |
| Meetings: | 99.30 | 89.37 | $70 | 6,255.90 |
| Regulations: | 0.00 | 0.00 | | 0.00 |
| Court (In Court): | 22.10 | 14.81 | $80 | 1,184.80 |
| Court (preparation): | 8.50 | 5.70 | $80 | 456.00 |
| Briefs and Memoranda: | 94.60 | 63.06 | $80 | 5,044.80 |
| Attorneys' Fees: | 4.30 | 3.87 | $60 | 232.20 |
| TOTALS: | 279.55 | 215.80 | | $15,903.10 |
| COSTS: 1981 | | | | $ 926.24 |
| TRAVEL: 1981 | (28 at $20.00) | | | $ 560.00 |

### OTHER COUNSEL 1976–1980

| | Hours | Adjustment | Rate | Total |
|---|---|---|---|---|
| J. Costello | 140.00 | 112.00 | $50 | $ 5,600.00 |
| W. Newman | 63.00 | 50.40 | $50 | 2,520.00 |
| T. Lesser | 127.50 | 102.00 | $60 | 6,120.00 |
| S. Arons | 50.20 | 40.16 | $70 | 2,811.20 |
| I. Horowitz | 84.80 | 67.84 | $70 | 4,748.80 |
| O. Fowlkes | 21.50 | 17.20 | $70 | 1,204.00 |
| TOTALS: | 487.00 | 389.60 | | $23,004.00 |
| COSTS: 1976–1980 | | | | $14,115.00 |
| TRAVEL: 1976 – 1980 | (303.0 at $20.00) | | | $ 6,060.00 |

GRAND TOTAL   1976–1981

| | |
|---|---|
| Attorney Schwartz: | $257,018.00 |
| Attorney Fleischner: | 50,778.70 |
| Travel: | 6,620.00 |
| Other Counsel: | 23,004.00 |
| SUBTOTAL: | $337,420.70 |
| $337,420.70 x 10%: | 33,742.07 |
| | $371,162.77 |
| COSTS: | 15,041.24 |
| TOTAL: | $386,204.01 |

VI.  *Conclusion*

Because of its sensitivity to the fact that these fees are to be paid out of the public treasury and acknowledging that the fee award though much reduced is high, the Court will permit defendants to pay the fee in two equal installments, the first to be paid on or before September 1, 1982 and the second on or before September 1, 1983.